BRUNDRETT v. HARGROVE, ADMINISTRATRIX.

4-6756                                        161 S. W. 2d 762

Opinion delivered May 11, 1942.

*R. W. Tucker* and *Arthur L. Adams,* for appellant.

*Dene H. Coleman* and *S. M. Casey,* for appellee.

McHANEY, J. Appellant operates two buses, one of which he drives himself and one driven by his employee, Price, between Batesville and Oil Trough, for the transportation of passengers for hire, each making two round trips daily. Price lives about one mile from Oil Trough on the highway to Batesville over which the bus line operates. Appellant operates under a permit so to do from the Corporation Commission and carries liability insurance, as he is required to do as a common carrier. With the knowledge and consent of appellant, Price drives his bus to his home and keeps it there over night, after completing his runs, and returns to Oil Trough the following morning to begin his schedule of trips to Batesville and return. In addition to his regular trips as above stated, appellant made special trips, called "show trips," three nights per week, including Saturday nights, to the south and east of Oil Trough, for the purpose of trans-

porting patrons to and from the picture show in Oil Trough. He usually made these "show trips" himself, but occasionally he had Price make them.

On December 21, 1940, Price was directed to make the "show trip," and, as was customary, after completing his day runs, drove his bus to his home to get his dinner and to bring his wife and children to the picture show. On his return to Oil Trough after dinner, his bus collided with a bicycle on which appellee's adult son and intestate, M. M. Hargrove, was riding, resulting in the death of the latter.

This action was brought by appellee, now deceased, to recover damages for the death of his son, charging negligent operation of the bus. It was defended on the grounds, among others, that at the time of the accident Price was not on the business of appellant, but on a mission of his own, outside the scope of his employment; and that there could be no recovery for conscious pain and suffering because deceased was killed instantly.

Trial resulted in a verdict and judgment in favor of appellee for $5,000 for loss of contributions of his adult son and for $2,500 for the benefit of his son's estate for conscious pain and suffering. This appeal followed in due course.

The judgment was rendered October 21, 1941. On April 6, 1942, the death of appellee, Monroe Hargrove, was suggested and conceded as having occurred on March 23, 1942, and this court entered an order that the case be revived in the name of Lillian Hargrove as administratrix in succession. On April 4, 1942, after both parties had filed briefs, appellant filed in this court his petition and brief to abate the action as to contributions because of the death of Monroe Hargrove, and this is the first question we have for determination. It is conceded that, if Monroe Hargrove, the father, had died prior to the judgment, the action as to him for loss of contributions would have abated and we agree with this concession. Appellant cites and relies upon the case of *Jenkins* v. *Midland Valley R. Co.*, 134 Ark. 1, 203 S. W. 1, construing and applying what are now §§ 1273, 1277 and 1278 of Pope's

Digest. We think this case is not in point as it was held that the right of action of the widow for the death of her husband did not survive her death. She died before judgment. Here, the case proceeded to judgment and was appealed to this court and briefed, before the death of Monroe Hargrove. The general rule is stated in 1 Am. Jur. 62, as follows: "The general rule is that an action is not abated by death after judgment. The action ceases upon a judgment, and, subject to the right of review, cannot be affected by events happening thereafter. . . ." C. J. S., § 167, says: "It is well settled in most jurisdictions that an action is not abated by the death of a party after the cause of action has been merged in a final judgment and while the judgment stands, even though the judgment is based on a cause of action which would not survive the death of a party before judgment." The adjudicated cases appear to support the general rule, so the motion to abate is denied.

For a reversal of the judgment, appellant first contends the court erred in permitting one of counsel for appellee to ask the members of the jury panel, over his objections and exceptions, on *voir dire,* whether any of them were connected, "directly or indirectly with any insurance company that carries liability insurance on trucks or carriers for hire, such as buses." We see no objection to the form of the question, which seems to be appellant's principal objection to it. The statute, § 2025 of Pope's Digest, as amended by Act 203 of 1939, requires all such carriers to carry a surety policy or bond for the protection of all persons and property from damages caused by the negligent operation of the motor vehicle carrier. Conceding that the object of the question was to inform the jurors of the existence of insurance and that appellant would not have to pay any judgment they might render, the question did not give them any information they did not presumptively already have. We think this matter is ruled adversely to appellant by *Mo. Trans. Co.* v. *Talley,* 199 Ark. 835, 136 S. W. 2d 688. Nor can we say the question was asked in bad faith, even though the attorney knew all the jurors.

It is next urged that the court should have directed a verdict for appellant at his request, because Price was

not on his master's business at the time of the accident. This question was submitted to the jury in instructions that told them that if he were on an errand of his own, in which appellant had no interest and with which he was in no manner connected, their verdict should be for appellant. But, if Price was driving the "bus there (to Oil Trough) on a trip or with the expectation of going on business for the defendant, Brundrett, then he would be in the employ of defendant." As stated above, appellant knew that it was the practice of Price to take the bus home with him and keep it there at night. We cannot say, as a matter of law, that Price had departed from the master's service and was on a mission of his own. He went home to get his dinner, and, incidentally, to bring his family back with him. He was on his way to make the "show run," and the jury had a right to find he was on the master's business. The cases of *Helena Wholesale Grocery Co.* v. *Bell*, 195 Ark. 435, 112 S. W. 2d 416, and *Ball* v. *Hail*, 196 Ark. 491, 118 S. W. 2d 668, rule the question against appellant.

It is next insisted that the verdict and judgment for conscious pain and suffering is without evidence to support it, and that in favor of the father for contributions is excessive. We agree with these contentions. The undisputed proof is that, when the bus struck the bicycle, the boy was thrown against the sharp corner of the bus with such force and violence that his head was split open wide enough to lay the edge of the hand in the skull and that a portion of the brains was thrown out and spattered over the bus. Mr. Allie Crouch, the undertaker, described the nature of the injury as follows: "Something sharp had struck the head, beginning at the bridge of the nose and angling just at the corner of the right eyebrow, from the top of the head and to the base of the skull. The skull was entirely cleft or separated, with this side of it dropped back, I would say an inch or three quarters of an inch indented. In other words, just mashed back by a sharp cut. That joint of the jaw was all broken in two, and all of the lower jaw was shattered on both sides. One could have easily slipped their hand into the cranial cavity for a space of possibly eight inches, beginning at

the nose through the top of the head and to the back; you could have slid your hand in there any place. And the contents of the cranium were visible. You could see very easily over the brain. Aside from that, why, the body had no other bumps or bruises.'' No witness testified that the boy was conscious after the accident. Jack Stewart, the first to reach the scene, said: ''He wasn't alive—his heart was still beating is all.'' Another witness stated he was alive when they loaded him in the car, that his heart was beating and that he snored through his nose two or three times. Another said the boy never opened his eyes and never spoke and he did not think he knew anything. Other testimony shows that he lived from 14 to 30 minutes, but there is no evidence that he groaned, or cried out or sobbed, only that he made some struggling movement and perhaps gasped or sighed once. We think the evidence shows such a terrible head injury as to preclude the possibility of consciousness from the moment of impact to death. As said in *St. L. S. W. Ry. Co.* v. *Braswell, Adm'r,* 198 Ark. 143, 127 S. W. 2d 637, ''Appellee alleged conscious pain and suffering, and therefore had the burden of proving the fact, either by direct or circumstantial evidence. The question is, Was the requirement met? We do not think so.'' The finding of the jury to the contrary was based on speculation and conjecture, and was without any substantial evidence to support it. All the direct and circumstantial evidence is to the contrary, and the judgment therefor must be reversed and the cause, to this extent, be dismissed.

The recovery in favor of the father for loss of con tributions in the sum of $5,000 is highly speculative. In *Mo. Pac. Trans. Co.* v. *Parker,* 200 Ark. 620, 140 S. W. 2d 997, in discussing the amount of recovery of a parent for loss of contributions by a minor, we said: ''The amount of the recovery is necessarily speculative. No one can know or testify what the value of the services of a minor child, less its necessary expenses, will be. Generally, where the minor is of tender age, the speculation must be limited to its minority. No legal obligation rests on a child to support a parent after majority, except as provided in § 7603, Pope's Digest.'' The evidence shows

that the deceased had just reached his majority; that he was a young man of good habits, did not smoke or drink; that he was frugal, industrious; and that he did not keep company with girls or show any disposition to marry. It is also shown that he spent two six month periods in CCC camps and, from his earnings of $30 per month, sent home or caused to be sent to his father $22 per month. The fact of these remittances cannot be given much weight, for, under the statute, U.S.C.A. Tit. 16, § 548h, he was required to do so. It is there provided that "enrollees with dependent member or members of their families shall be required, under such regulations as may be prescribed by the director, to make allotments of pay to such dependents." In addition to this requirement and without reference to it, at the time he was such an enrollee, he was a minor and his father was legally entitled to the son's earnings. While this boy might have continued to give his earnings to his father after his majority, it appears to be pure speculation as to just how long he would continue to do so. We think the highest amount the evidence may be said to support is the sum of $2,500.

If appellee will enter a remittitur for the excess within 15 judicial days the judgment as to this item will be affirmed for $2,500, otherwise it will be reversed and the cause remanded for a new trial.

HUMPHREYS, J., dissents from both orders. MEHAFFY, J., dissents from order on pain and suffering.